UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **TACTACELL, LLC** | **CIVIL DOCKET NO. 6:22-cv-00773** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **DEER MANAGEMENT SYSTEMS, LLC, ET AL** | **MAGISTRATE JUDGE DAVID J. AYO** |

## MEMORANDUM RULING

Before the Court is a MOTION FOR SUMMARY JUDGMENT ON CONTRACT TERMINABILITY AND TERM (the "Motion") filed by the defendants, Deer Management Systems, LLC (hereinafter, "DMS") and Tactacam, LLC (hereinafter, "Tactacam") (collectively, "Defendants") in the above-captioned matter. [Doc. 314]. The plaintiff, Tactacell, LLC (hereinafter, "Tactacell" or "Plaintiff") opposes the Motion, [Doc. 324], and Defendants filed a reply brief. [Doc 329]. For the following reasons, Defendants' Motion is GRANTED.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This lawsuit arises out of a failed business relationship between Tactacell and DMS. On March 6, 2020, Tactacell and DMS entered into a services contract entitled "Independent Contractor Agreement" (hereinafter, "ICA") in which Tactacell agreed to provide services listed in Section 2 of the ICA to DMS. [Doc. 263-1].[1] After a period

---

[1] The services listed in Section 2 of the ICA are:

  i. Examine market trends in the defined territories;
  ii. Establish sales strategies;
  iii. Meet with potential clients, present products, manage complaints, and ensure follow ups;

Page **1** of **17**

of time during which DMS believed Tactacell was no longer performing under the ICA, on June 10, 2021, DMS sent a letter to Tactacell by certified mail, purporting to terminate the ICA for failure to provide "certain services under Section 2" of the ICA, and specifically terminating "for cause consistent with Section 7" of the agreement. [Doc. 263-5].  Subsequently, in March 2022, Tactacell filed a lawsuit against DMS,[2] asserting, *inter alia*, that the June 2021 termination was improper.  [Doc. 1].

At the heart of the instant Motion is a disagreement concerning the term and terminability of the ICA.  Relevant provisions in the contract that reference the term or duration of the ICA are as follows:

> **[Section] 1. Term**.  The term of this Agreement shall begin on the Effective Date and *continue until termination* as set forth in Section 7 [of] this Agreement.
>
> **[Section] 3. Exclusivity**.  The Contractor is forbidden, *during the duration of this Agreement, and for two (2) years following the termination of agreement by either party*, to provide competing services or sell competing products, whether directly or indirectly, in any capacity with an individual, intermediary, or company that provides products and/or services that directly complete with the products and services offered by the Company (a "Competitor"). . . .
>
> **[Section] 6. Relationship**.  . . . The Contractor is allowed to provide services to other clients, so long as such other clients do not offer products and services that directly compete with the Company and its products and services.  This non-competition restrictive covenant is in

---

> iv. Participate at different representation activities (trade fairs, shows, company visits, etc.);
> v. Analyze sales reports from independent sales representatives;
> vi. Accompany independent sales representatives for client visits, when necessary for retention of existing customers.

[Doc. 263-1, p. 1].

[2]    Tactacam, LLC, was added as a party defendant on May 17, 2023, by way of the Plaintiff's First Amended and Supplemental Complaint.  [Doc. 38].

effect *for the duration of this Agreement and for two (2) years following the termination of this Agreement.*

**[Section] 7. Termination**.  This Agreement may be terminated by Contractor, upon written notice to the Company not less than sixty (60) days in advance.  Notice shall be deemed to have been sufficiently given either when served personally or sent by registered or certified mail return receipt requested addressed to the parties at their last known addresses. Any and all restrictive covenants associated with confidentiality, non-solicitation, and non-competition shall remain in full force and effect after termination. This Agreement may be terminated by Company only (i) for "Cause" (as defined herein) or (ii) non-performance of duties set forth in Section 2 of this Agreement.  Termination of Contractor for Cause requires no notice period and the Agreement, but for those portions intended to survive beyond its termination, shall terminate immediately upon written notification.

This Agreement may be terminated for Cause (as defined below) by the Company if the Contractor (i) materially violates the provisions of the Non-Competition provision or the Confidentiality provision between the Company and Contractor, (ii) is convicted of any crime involving misuse or misappropriation of money or other property of the Company or any felony; (iii) exhibits repeated willful or wanton failure or refusal to perform his duties in furtherance of the Company's business interest or in accordance with this Agreement, which failure or refusal is not remedied by the Contractor within thirty (30) days after written notice from the Company providing details on such failure or refusal; (iv) commits an intentional tort against the Company, which materially adversely affects the business of the Company; (v) commits any flagrant act of dishonesty or disloyalty or any act involving gross moral turpitude, which materially adversely affects the business of the Company; or (vi) exhibits immoderate use of alcohol or drugs which, in the opinion of an independent physician selected by the Company and Contractor, impairs the Contractor's ability to perform his duties hereunder (all of the foregoing clauses (i) through (vi) constituting reasons for termination for "Cause"), provided that unsatisfactory business performance of the Company, or mere inefficiency, or good faith errors in judgment or discretion by the Contractor shall not constitute grounds for termination for Cause hereunder. In the event of a termination for Cause, the Company may by written notice immediately terminate this Agreement and, in that event, the Company shall be obligated only to pay the Contractor the compensation due him up to the date of termination, all accrued, vested or earned benefits under any

> applicable benefit plan and any other compensation to which the Contractor is entitled under Section 4 and 5 up to and ending on the date of the Contractor's termination. The restrictive covenants contained in this Agreement shall survive the termination of this Agreement, whether for Cause or otherwise, consistent with their respective terms.
>
> **[Section] 9. Non-Solicitation of Clients**. *During and for a period of two (2) years following the Term of this Agreement, or its Termination*, the Contractor, its owners, agents, assigns, and/or affiliates shall not directly or indirectly attempt to solicit for the purposes of obtaining business or making sales, any person, firm, or corporation that received or purchased products or services from the Company during the Contractor's tenure with the Company for the purpose of selling similar or competing product and/or service.

[Doc. 94-7] (emphasis added).

After a series of motions were filed by the parties, the Court held a status conference on June 27, 2024, to explain that bifurcation of certain issues would streamline the case and assist in the management of the litigation, as follows:

> After looking at the evidence and the motions filed, the one kind of clear decision point is whether or not DMS's termination of the contract for cause was legally effective. I've ruled that that is a factual issue about – hinging specifically on what Mr. Busbice did or did not do under the terms of the contract. Okay. There's also, of course, contractual interpretation issues of what was required to terminate for cause and things of that nature.
>
> After that, assuming for a moment that the termination for cause was not legally effective, as plaintiffs contend, then there's a lot of other questions we have to answer. We have to answer a question about whether or not this was an indefinite or perpetual contract. We have to answer if it was an indefinite contract, when was it reasonable to terminate it under the specific facts here. We have to determine what damages are owed under indefinite contract. If I determine it's a perpetual contract, we have to figure out what damages are owed under, a perpetual contract, and these are all very hypothetical questions because, again, we don't know at this point whether or not the termination for cause was legally valid.
>
> …

Page 4 of **17**

> After the adjudication of [the Phase I trial], of course, if the termination for cause was legally effective, then I think that pretty much ends the case. Maybe there are some disputes about whether or not everything was paid up to that point in an appropriate manner.
>
> Of course, if the termination for cause was not valid and it was not done appropriately, as the jury will determine, then we have a lot of other decisions to make which we'll do.

[Doc. 197, pp. 4-5].

Thereafter, on July 15, 2024, the Court bifurcated the issue of whether DMS's purported June 10, 2021, termination of the ICA was proper from the remaining issues in the case, as follows:

> IT IS FURTHER ORDERED that a trial on the discrete issue of whether Defendant Deer Management Systems, LLC's purported termination of its independent contractor agreement with Plaintiff Tactacell, LLC, pursuant to the terms of Paragraph 7 of that Agreement, was legally effective under Minnesota law ... will being on October 2, 2024.

[Doc. 186] (the "Bifurcation Order"). The parties went to trial on the bifurcated issue on October 2-4, 2024, and the jury returned a verdict in favor of Tactacell. [Doc. 261].

In the instant Motion, Defendants seek summary judgment on the issue of whether the ICA is perpetual in duration, or whether the ICA is a contract with an indefinite term that is terminable at will upon reasonable notice after a reasonable time has passed. All issues having been fully briefed by the parties, the Motion is now ripe for review.

### SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant bears the burden of demonstrating the absence of a genuine dispute of material fact but need not negate every element of the nonmovant's claim. *Hongo v. Goodwin*, 781 F. App'x 357, 359 (5th Cir. 2019), *citing Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). If the movant meets this burden, the burden then shifts to the nonmovant who is required to "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). However, summary judgment cannot be defeated through "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)).

In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

S. Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The motion for summary judgment should be granted if the non-moving party cannot produce sufficient competent evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## LAW AND ANALYSIS

### I.   PROPRIETY OF THE DEFENDANTS' MOTION

Before the Court addresses the substance of the Motion, it will briefly address Tactacell's assertion that the Defendants' Motion is improper because Tactacell prevailed at the Phase I trial. [Doc. 324-1, p. 4]. Specifically, Tactacell asserts that, by arguing that the question of the duration of the ICA is a question of law for the Court's consideration, Defendants are "refusing to accept reality" and "need a dose of reality and to come to accept that they lost the liability trial and the only question now is how much they owe based on their improper termination of the ICA." [Doc. 324-1, pp. 2-3].[3]

---

[3]   The Court finds it appropriate to issue a word of caution about the tone and tenor of Tactacell's briefing, particularly with respect to Tactacell's characterization of the Defendants' arguments on the foregoing points. It is not professional to goad or belittle opposing counsel – either in person or in briefing. Calling opposing counsel "delusional" and admonishing them to "accept reality" are particularly troublesome – particularly where the goading attorney is wrong – and cross the line of zealous advocacy, wading into unprofessional conduct. This behavior is inconsistent with the spirit of the Louisiana Rules of Professional Conduct. Tactacell's counsel in this matter has already been warned on prior occasions about his conduct in the courtroom. Going forward, counsel is strongly cautioned and provided notice that any acerbic or unprofessional conduct will not be tolerated and will be subject to sanctions by this Court.

Tactacell's assertions in these regards are disingenuous. First, the scope of the Phase I trial was narrow, encompassing only the issue of whether DMS's purported termination of the ICA was legally effective. [Doc. 186]. Indeed, prior to bifurcating the trial, the Court clearly explained the purpose of the bifurcation at the June 27, 2024, status conference, providing a roadmap for the issues that remain unresolved after the Phase I jury trial.[4] [Doc. 197, pp. 4-5]. The Defendants' Motion now before the Court is wholly consistent with the Court's discussion and instruction on the record.

And despite Tactacell's mistaken characterization of the purpose of the Phase I trial, and as is clear in the record of this case, neither liability nor breach of contract has yet been specifically determined in this matter. All that has been decided is that DMS did not terminate the ICA by virtue of its June 21, 2021, letter to Tactacell. And because no determination about whether and to what extent damages are owed can be made without knowing the duration of the ICA, the Defendants' Motion seeking a ruling on this issue of law is an appropriate step towards bringing this matter to resolution.

---

[4]  At trial, the Verdict Form presented the following question for the jury:

> Do you the jury unanimously find that Plaintiff, Tactacell, LLC, has proven by a preponderance of the evidence that the Defendant, Deer Management Systems, LLC, improperly terminated the Independent Contractor Agreement under the terms of that Agreement and in accordance with the law of contracts in Minnesota?

[Doc. 261].

The jury responded "Yes" to this question, which clearly asked *only* whether DMS improperly terminated the ICA.

Page **8** of **17**

Tactacell also mischaracterizes the Court's prior rulings on the parties' summary judgment motions. Contrary to Tactacell's assertion, the Court did not previously reject a finding that the ICA is not perpetual. Rather, the Court concluded that it would not resolve the question of duration until a jury determined whether DMS's termination was legally valid. [Doc. 197, pp. 4-5]. Now that the Phase I trial has determined that Defendants' termination for cause was not legally effective as of June 10, 2021, the issue of the ICA's duration is ripe. [Doc. 261].

## II.   PERPETUAL CONTRACTS UNDER MINNESOTA LAW

The primary issue before the Court is whether the ICA between Tactacell and DMS constitutes a contract of perpetual duration. Section 15 of the ICA provides that Minnesota law governs the construction and interpretation of the agreement. [Doc. 263-1, p. 5]. In their Motion, Defendants argue that the ICA does not unambiguously state an intent to be perpetual, and the ICA is, therefore, a contract of indefinite duration, terminable by DMS upon reasonable notice and within a reasonable time. [Doc. 314-1, pp. 15-16].[5] In response, Tactacell contends that the ICA was intended to be perpetual, relying on both the language of the agreement and parol evidence. [Doc. 324-1].

"[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018), *citing Motorsports Racing Plus, Inc. v. Arctic Cat*

---

[5]   Specifically, Defendants seek resolution of the question of whether the ICA is: (1) a contract of perpetual duration, or (2) a contract that is (i) terminable by DMS with reasonable notice or (ii) if not terminable by DMS, is a contract limited by law to a reasonable term. [Doc. 314-1, p. 8].

*Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). Interpretation of unambiguous contracts is a question of law for the court, as is the determination that a contract is ambiguous. *Staffing Specifix*, 913 N.W.2d at 692, *citing Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003). *See also citing Storms, Inc. v. Mathy Constr. Co.*, 883 N.W.2d 772, 776 (Minn. 2016). The terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation, and a contract's terms are not ambiguous simply because the parties' interpretations differ. *Staffing Specifix*, 913 N.W.2d at 692.

Under Minnesota law, perpetual agreements are generally disfavored as a matter of public policy. *Glacial Plains Cooperative v. Chippewa Valley Ethanol Company, LLLP*, 912 N.W.2d 233, 236 (Minn. 2018). Therefore, courts will only enforce a contract that <u>unambiguously</u> expresses an intent to be perpetual, and ambiguous language regarding duration is construed <u>against</u> perpetual duration. *Glacial Plains*, 912 N.W.2d at 233 (emphasis added). A contract including language that can reasonably be interpreted as expressing an intent for a contract of either indefinite duration or perpetual duration is ambiguous and, therefore, construed as indefinite. *Gruhot v. Crown Castle Intern Corp.*, WL 5671768 (Minn. Dist. Ct. June 29, 2023). *See also Glacial Plains,* 912 N.W.2d at 237; *CNH Indus. N.V. v. Reese,* 583 U.S. 133, 134 (2018) ("Contracts that are silent as to their duration will ordinarily be treated not as operative in perpetuity but as operative for a reasonable time.").

As mentioned hereinabove, the ICA is, in essence, a contract for the personal services of Matt Busbice. The object of the contract was the promotion of DMS's trail camera by Matt Busbice, the principal of Tactacell. In exchange, Tactacell would

receive compensation for Busbice's services in varying amounts based on DMS's profits from the sale of that camera.[6] Under Minnesota law, generally, a contract for personal services, whether it be on a year-to-year or indefinite basis, is terminable at the will of either party, absent a contractual understanding on the duration of employment or some consideration provided by the employee in addition to the duties of employment. *Engelstad v. Virginia Mun. Hosp.*, 718 F.2d 262, 266 (8th Cir. 1983) (doctor's employment contract with hospital was terminable at will absent contractual understanding on duration or some consideration provided by employee in addition to duties of employment), *citing Lundeen v. Cozy Cab Mfg. Co.,* 288 Minn. 98, 179 N.W.2d 73, 75 (1970); *Degen v. Investors Diversified Services,* 260 Minn. 424, 110 N.W.2d 863, 866-67 (1961). Indeed, the general rule in this country has long been that a personal services contract of indefinite duration may be terminated at will by either party. *Olander v. State Farm Mut. Auto. Ins. Co.*, 317 F.3d 807, 810 (8th Cir. 2003), *citing Willcox & Gibbs Co. v. Ewing,* 141 U.S. 627, 635–36, 12 S. Ct. 94, 35 L.Ed. 882 (1891); 1 Richard Lord, WILLISTON ON CONTRACTS § 4.20 (4th ed. 1990).

But here, the Court need not rely on the general rule for personal services contracts. Instead, it is bound by a more fundamental principle of the Minnesota law of contracts as described by that state's highest court. In *Glacial Plains*, the Minnesota Supreme Court examined a contract that contained a provision stating, "[i]t is the intent of the parties that this agreement shall continue indefinitely until

---

[6] *See, e.g.*, Section 6 of the ICA, which provides that Tactacell is an independent contractor and is "allowed to *provide services* to other clients, so long as such other clients do not offer products and services that directly compete with [DMS] and its products and services." (emphasis added).

either terminated by the terms of this agreement, or by the mutual agreement of both parties." 912 N.W.2d at 237. Acknowledging that the "'until' phrasing suggests that the contract will continue forever unless there is a breach or mutual agreement to end the contract," the court went on to note that the same paragraph used the word "indefinitely" – not "forever," "perpetually," and not "permanently" – to describe how long the contract would continue. *Id.* In concluding that the duration language of the contract was ambiguous, the court stated:

> While we do not impose a "magic words" requirement on contracts of perpetual duration, the use of the word "indefinitely" creates uncertainty as to whether the contract is meant to be of indefinite duration or perpetual duration. The language of the contract can reasonably be interpreted as expressing an intent for a contract of either indefinite duration or perpetual duration. Thus, this language is ambiguous.
>
> Because the durational language of the contract is ambiguous, we will construe it against perpetual duration. As there is no definite duration expressed in the contract, we conclude that the contract must be one of indefinite duration. A contract of indefinite duration is terminable at will upon reasonable notice to the other party after a reasonable time has passed. Because the parties' contract in this case is one of indefinite duration, it is therefore terminable at will by either party upon reasonable notice after a reasonable time has passed.

*Id.* (internal citations omitted).

Similarly, the ICA in this case contains a number of sections that create ambiguity as to duration. For example, Section 7 of the ICA states that, "[t]his agreement may be terminated by Company only (i) for "Cause" (as defined herein) or (ii) non-performance[,]" [Doc. 94-7, § 7] (emphasis added), but Section 8 goes on to reference "the termination or <u>expiration</u> of this Agreement," suggesting that the ICA is not perpetual and may expire. *Id.*, § 8 (emphasis added). This reference to the

Page **12** of **17**

"expiration" of the contract, along with the reference in Section 9 to "following the term of this Agreement, or its Termination," suggest a term that the parties did not intend to be perpetual. And, when read along with the provisions of the ICA that reference the exclusive circumstances under which the ICA can be terminated, this language creates ambiguity as to the duration of the contract.[7] It is true that Section 1 of the ICA contains language that the "[a]greement shall begin on the Effective Date and continue until terminated as set forth in Section 7," *Id.*, § 1, which the Court in *Glacial Plains* found militates in favor of a perpetual duration. *Glacial Plains*, 912 N.W.2d at 237. However, as in *Glacial Plains*, the ICA contains additional language that renders Section 1 ambiguous. For example, Section 9 includes a non-solicitation clause that applies "for a period of two (2) years following the Term of this Agreement, or its Termination," *Id.*, § 9, further suggesting an intent not to create a contract in perpetuity.

Therefore, based upon the language in the ICA and the governing law, the Court concludes that the ICA: (i) does not evince an unambiguous intent to create a perpetual contract; and (ii) contains ambiguous language regarding duration. A holistic view of the ICA also supports this finding. While the ICA is ambiguous and poorly drafted in many respects, it is perfectly clear on two very important points: (i) the ICA did not purport to grant Tactacell an ownership interest in DMS, nor were Tactacell or Matt Busbice investors in DMS; and (ii) payment was only due to

---

[7] Indeed, the Court has previously stated that the ICA is ambiguous. [Doc. 238, p. 8] ("I've read the contractor agreement several times. In nearly every way relevant to this dispute, the independent contractor agreement is ambiguous.").

Tactacell for as long as Tactacell was performing services in accordance with the terms of the contract. Indeed, the ICA called for the payment of a commission to Tactacell, beginning at a rate of 1% and going as high as 3%, with a specific provision that DMS "has the right to terminate this agreement if [Tactacell] is not free to perform all duties set forth in Section 2 of this Agreement by December 31, 2021." *Id.*, § 4. And the ICA clearly contemplates the ability of DMS to terminate the services of Tactacell for "non-performance" of services, *Id.*, § 7, and/or "willful or wanton failure or refusal to perform his duties" in furtherance of DMS's business interests. *Id.* These provisions are clear that the ICA's compensation terms are premised on and dependent upon the provision of services by Tactacell. The ICA does not in any respect evidence the parties' intent that it extend perpetually and without regard to Tactacell's performance of personal services.

Plaintiff's reliance on the clause in Section 7 stating that the ICA may be terminated "only" for cause or non-performance does not alter this analysis.[8] As discussed above, in *Glacial Plains*, the contract similarly limited termination to cases of "default or failure to perform," yet the court nevertheless held that the agreement

---

[8] To the extent Plaintiff relies on *S. Wine & Spirits of Nevada v. Mountain Valley Spring Co.*, LLC, 646 F.3d 526, 532 (8th Cir. 2011), the Court does not find this case persuasive. First, for the reasons stated *supra*, language that merely speaks to when the ICA terminates does not render the contract automatically perpetual. The same is true for Plaintiff's reliance on *Lamoureux v. MPSC, Inc.,* 849 F.3d 737 (8th Cir. 2017). *Lamoureux* predates *Glacial Plains,* the Minnesota Supreme Court case that governs here. Because this Court is sitting in diversity, we must apply Minnesota substantive law as interpreted by the Minnesota Supreme Court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Furthermore, the contractual language in *Southern Wine* and *Lamoureux* is distinguishable. Unlike those cases, the ICA at issue contains additional ambiguous terms, such as references to "expiration" and phrases like "following the Term," that undermine any clear intent to create a perpetual agreement. [Doc. 263-1].

was not perpetual because of the inclusion of other words and phrases that created ambiguity as to the parties' intent on the issue of duration. *Glacial Plains*, 912 N.W.2d at 235. Additionally, Plaintiff's assertion that the ICA's right of first refusal is perpetual is unsupported as there is no clear intent demonstrated to hold this right open forever. Indeed, Section 5 of the ICA,[9] which governs the issue of the right of first refusal, is silent as to term. Rather than having a perpetual duration, "[c]ontracts that are silent as to their duration will ordinarily be treated not as operative in perpetuity but as operative for a reasonable time." *CNH Indus. N.V. v. Reese,* 583 U.S. 133, 134 (2018). Nor is the fact that both parties are limited liability companies with perpetual existence relevant to the interpretation of the ICA's duration.

Finally, Plaintiff's argument that ambiguity invites parol evidence to determine the duration of the contract is likewise without merit as to this specific issue.[10] As discussed in *Glacial Plains*, *supra*, under Minnesota law, a contract of

---

[9]  Section 5 states:

> Additional Incentives. Contractor will be given first right of refusal on any stock offering Company may make available to anyone outside the initial and original stockholders. Once Company provides Contractor with the stock offering details (i.e. price, percent available, etc.) Contractor will have 30 days to notify Company of Contractor[']s decision to exercise or pass on Contractor[']s first right of refusal.

[Doc. 94-7].

[10]  The primary goal of contract interpretation is to determine and enforce the intent of the parties. *Motorsports Racing Plus, Inc., v. Arctic Cat Sales, Inc.,* 666 N.W.2d 320, 323 (Minn.2003). "Where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself." *Metro. Sports Facilities Commn. v. General Mills,* 470 N.W.2d 118, 123 (Minn.1991). Extrinsic or parol evidence is only admissible where

perpetual duration will be enforced only when the contract itself contains an <u>unambiguous</u> expression of the parties' intent to create such a contract. 912 N.W.2d at 237 (emphasis added). And ambiguous language regarding duration is construed <u>against</u> perpetual duration. *Id.* at 233.[11] In other words, ambiguity as to duration precludes a finding of perpetuity. Therefore, parol evidence cannot be used to overcome the requirement that such intent be unambiguously expressed in the contract. *See, e.g., Id.* at 237 (determining whether a contract was perpetual based solely on the language in the contract, without the use of parol evidence). *See also PlaNet Prods., Inc. v. Shank,* 119 F.3d 729, 732 (8th Cir. 1997) (while parol evidence may be used to clarify an ambiguous contract, "[a] party cannot use parol evidence to create an ambiguity or to show that an obligation is other than that expressed in the written instrument"). Simply put, because perpetual contracts must clearly and expressly state an intent to be perpetual, and the ICA does not do so, the Court may not consider extrinsic evidence to establish such an intent.

Because the durational language of the ICA is ambiguous, the Court construes the language against perpetual duration. As there is no definite duration expressed in the contract, the Court concludes that the ICA is one of indefinite duration. *See*

---

a contract is ambiguous. *See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.,* 664 N.W.2d 303, 312 (Minn. 2003).

[11] Contract provisions are not to be read in isolation, but instead in light of their surrounding context. *Michaels Stores, Inc. v. Sun Life Assurance Co. of Canada,* 412 F. Supp. 3d 854, 857 (D. Minn. 2019) *citing RAM Mut. Ins. Co. v. Rohde,* 820 N.W.2d 1, 14 (Minn. 2012). "The intent of the parties is not ascertained by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole." *Savela v. City of Duluth,* 806 N.W.2d 793, 801 (Minn. 2011).

*Glacial Plains*, 912 N.W.2d at 237. Under Minnesota law, a contract of indefinite duration is terminable at will upon reasonable notice to the other party after a reasonable time has passed. *Id.*, *citing Borg Warner Acceptance Corp. v. Shakopee Sports Ctr., Inc.*, 431 N.W.2d 539, 541 (Minn. 1988); *Benson Co-op. Creamery Ass'n v. First Dist. Ass'n*, 276 Minn. 520, 151 N.W.2d 422, 426 (1967) ("The general rule is that a contract having no definite duration, expressed or which may be implied, is terminable by either party at will upon reasonable notice to the other."). Because the ICA in this case is one of indefinite duration, the Court finds it to be terminable at will by either party upon reasonable notice after a reasonable time has passed.

## CONCLUSION

Considering the foregoing,

IT IS HEREBY ORDERED that DMS's partial MOTION FOR SUMMARY JUDGMENT ON CONTRACT TERMINABILITY AND TERM [Doc. 314] is GRANTED.

THUS, DONE AND SIGNED in Chambers on this 25th day of July 2025.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE