# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| **TACTACELL, LLC** | **CIVIL DOCKET NO. 6:22-cv-00773** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **DEER MANAGEMENT SYSTEMS, LLC, ET AL** | **MAGISTRATE JUDGE DAVID J. AYO** |

## MEMORANDUM RULING

Before the Court are two matters in the above-captioned case: (i) a MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE TERMINATION DATE OF THE ICA (the "Motion") filed by the Defendants, Deer Management Systems, LLC (hereinafter, "DMS") and Tactacam, LLC (hereinafter, "Tactacam") (collectively, "Defendants") [Doc. 353]; and (ii) a MOTION TO REVIEW MAGISTRATE JUDGE'S RULING on a Motion to Compel (the "Appeal") [Doc. 357], filed by Plaintiff Tactacell, LLC ("Tactacell").[1]  Tactacell requests a hearing in connection with Defendants' Motion [Doc. 360], which is DENIED.  For the following reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART, and Tactacell's Appeal is DENIED.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This lawsuit arises out of a failed business relationship between Tactacell and DMS.  On March 6, 2020, Tactacell and DMS entered into a personal services contract entitled "Independent Contractor Agreement" (hereinafter, "ICA") in which Tactacell,

---

[1]   Tactacell opposes DMS's Motion for Partial Summary Judgment, [Doc. 359], and Defendants filed a Reply [Doc. 361].  DMS opposes Tactacell's Appeal [Doc. 364], and Tactacell filed a Reply [Doc. 369].

through its owner Matthew Busbice, agreed to provide services listed in Section 2 of the ICA to DMS.[2] [Doc. 263-1]. After a period of time during which DMS believed Tactacell was no longer performing under the ICA, on June 10, 2021, DMS sent a letter to Tactacell by certified mail, purporting to terminate the ICA for failure to provide "certain services under Section 2" of the ICA, and specifically terminating "for cause consistent with Section 7" of the agreement. [Doc. 263-5]. Subsequently, in March 2022, Tactacell filed a lawsuit against DMS,[3] asserting, *inter alia*, that the June 2021 termination was improper. [Doc. 1]. Pursuant to a choice of law provision in the ICA, Minnesota law applies to the parties' dispute. [Doc. 92-2, ¶ 15].

On July 15, 2024, the Court bifurcated the issue of whether DMS's purported June 10, 2021, termination of the ICA was proper from the remaining issues in the case. [Doc. 186] (the "Bifurcation Order"). The parties went to trial on the bifurcated issue on October 2-4, 2024, and the jury returned a verdict in favor of Tactacell, finding that DMS's purported termination was not in accordance with the terms of the ICA. [Doc. 261].

---

[2]   The services listed in Section 2 of the ICA are:

    i.   Examine market trends in the defined territories;
   ii.   Establish sales strategies;
  iii.   Meet with potential clients, present products, manage complaints, and ensure follow ups;
  iv.   Participate at different representation activities (trade fairs, shows, company visits, etc.);
   v.   Analyze sales reports from independent sales representatives;
  vi.   Accompany independent sales representatives for client visits, when necessary for retention of existing customers.

[Doc. 263-1, p. 1].

[3]   Tactacam, LLC was added as a party defendant on May 17, 2023, by way of Plaintiff's First Amended and Supplemental Complaint. [Doc. 38].

Following trial, on July 28, 2025, the Court granted a motion for partial summary judgment filed by Defendants, finding that, under Minnesota law, the ICA is a contract of indefinite duration and, accordingly, was terminable by either party upon reasonable notice after a reasonable time had passed. [Doc. 331]. *See, e.g., Glacial Plains Coop. v. Chippewa Valley Ethanol Co., LLLP*, 912 N.W.2d 233, 237 (Minn. 2018), *citing Borg Warner Acceptance Corp. v. Shakopee Sports Ctr., Inc.*, 431 N.W.2d 539, 541 (Minn. 1988); *Benson Co-op. Creamery Ass'n v. First Dist. Ass'n*, 276 Minn. 520, 151 N.W.2d 422, 426 (1967) ("The general rule is that a contract having no definite duration, expressed or which may be implied, is terminable by either party at will upon reasonable notice to the other.").

Defendants now seek a summary order from this Court establishing two points as a matter of law: (1) that the period of time between the beginning of the ICA (March 6, 2020) to the date that DMS attempted to terminate the ICA (June 10, 2021) – a period of 14 months – constitutes a reasonable time within which to terminate the ICA under the Minnesota Supreme Court's holding and analysis in *Glacial Plains*; and (2) that the maximum amount of time required to provide notice of the termination to Tactacell was either December 31, 2021, or, at the latest, March 22, 2022.

With respect to the issues raised in Tactacell's Appeal, the Court is asked, again, to overrule a discovery decision of the Magistrate Judge related to claims the Court has already determined cannot go forward. Specifically, in August 2024, the Magistrate Judge denied as premature Tactacell's motion to compel discovery related to the sale of DMS to Bertram Capital in light of the Phase I trial but permitted re-

urging the Motion in anticipation of Phase II. [Doc. 212]. Tactacell later moved for leave to amend its Complaint to add claims seeking a percentage of the DMS sale to Bertram Capital because of DMS's alleged failure to provide Tactacell with a right of first refusal for the sale. [Doc. 278]. But the Magistrate Judge denied leave on July 28, 2025, [Doc. 332], and this Court affirmed that ruling on September 26, 2025, finding that, among other things, Tactacell had waited more than a year to seek to allege the claims, which would result in substantial prejudice to DMS. [Doc. 354]. Tactacell then re-urged its motion to compel, [Doc. 279], which sought discovery related to the damages claims, and on September 30, 2025, the Magistrate Judge denied the motion as moot because the amendment to assert sale-related damages had been denied and affirmed. [Doc. 356]. Tactacell now asks this Court to reverse the Magistrate Judge's September 30, 2025, Ruling and grant its Re-Urged Motion to Compel. [Doc. 279].

All issues having been fully briefed by the parties, the Motion and Appeal are now ripe for review.

## I.   Motion for Partial Summary Judgment on the Termination Date of the ICA (the "Motion") [Doc. 353]

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*

*v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant bears the burden of demonstrating the absence of a genuine dispute of material fact but need not negate every element of the nonmovant's claim. *Hongo v. Goodwin*, 781 F. App'x 357, 359 (5th Cir. 2019), *citing Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). If the movant meets this burden, the burden then shifts to the nonmovant who is required to "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). However, summary judgment cannot be defeated through "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)).

In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The motion for summary judgment should be granted if the non-moving party cannot produce sufficient

competent evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

### A. Governing Principles for Termination of Indefinite-Duration Contracts

Under Minnesota law, an indefinite-duration contract is terminable at will by either party upon reasonable notice after a reasonable time has passed. *Glacial Plains Coop. v. Chippewa Valley Ethanol Co., LLLP*, 912 N.W.2d 233, 237 (Minn. 2018) (*Glacial Plains I*), *citing Borg Warner Acceptance Corp. v. Shakopee Sports Ctr., Inc.*, 431 N.W.2d 539, 541 (Minn. 1988); *Benson Co-op. Creamery Ass'n v. First Dist. Ass'n*, 151 N.W.2d 422, 426 (Minn. 1967) ("The general rule is that a contract having no definite duration, expressed or which may be implied, is terminable by either party at will upon reasonable notice to the other."). In determining whether an indefinite-duration contract has been properly terminated, the Court conducts a two-step inquiry: (1) has the contract run for a reasonable time given the parties' relationship, performance, and investments; and (2) once a reasonable time has passed, was reasonable notice of termination provided. *Glacial Plains I*, 912 N.W.2d at 237.

The determination of what constitutes a reasonable time or reasonable notice is often fact-dependent and informed by the practical realities of the parties' relationship. *See Borg Warner Acceptance Corp. v. Shakopee Sports Ctr., Inc.*, 431 N.W.2d 539, 541 (Minn. 1988); *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997). At the summary judgment stage, the Court's task is to determine whether the nonmoving party has produced evidence sufficient to permit a reasonable fact-finder to conclude that the contract remained in effect for a reasonable time beyond the

termination date asserted by the moving party. *DLH*, 566 N.W.2d at 70. The inquiry focuses on whether the non-terminating party was afforded a fair opportunity to perform under the agreement, wind down the relationship, or recoup any identifiable investment. *Viking Supply v. Nat'l Cart Co.*, 310 F.3d 1092, 1098 (8th Cir. 2002); *Kaiser v. Direct Focus, Inc.*, 2004 WL 2050560, at *3 (Minn. App. 2004). Where the record contains no evidence of continued performance, reliance, or investment beyond a particular point in time, the outer boundary of any reasonable time period may be determined as a matter of law. *See Frerichs Constr. Co. v. Minn. Counties Ins. Trust*, 666 N.W.2d 398, 402 (Minn. App. 2003). *See also Glacial Plains*, 2018 WL 8049074, at *2 (Minn. App. 2018) (affirming the decision of the district court after remand from the Minnesota Supreme Court) (*Glacial Plains III*).

With the foregoing principles in mind, the Court will apply Minnesota's two-step inquiry to the facts of this case as elicited in the Phase I trial and provided by the parties in the summary judgment record.

    **B.**    **Reasonable Time**

Under *Glacial Plains*, the Court must first consider the individualized circumstances of this case in determining when a reasonable time might have passed and the ICA could be terminated. *Glacial Plains I*, 912 N.W.2d at 237. DMS urges the Court to apply the doctrine of equitable recoupment in making this determination. After the Minnesota Supreme Court decided *Glacial Plains*, it remanded the matter to the district court for a reasonable time determination, and the district court held that the theory of equitable recoupment informed that decision. *Glacial Plains Co-op. v. Chippewa Valley Ethanol Co., LLLP*, 2018 WL 8049074, at

\*4 (D. Minn. 2018) (*Glacial Plains II*). On appeal from the district court, the Minnesota appellate court defined recoupment as follows:

> Recoupment seeks to "remedy the inequity" that might otherwise occur when one party requires another to make a "sizeable investment in the furtherance" of a contract and, following termination of that contract, the investing party has "substantial unrecovered expenditures."

*Glacial Plains III*, 2019 WL 4409417 at \*4, *citing Ag-Chem Equip. Co. v. Hahn, Inc.*, 480 F.2d 482, 486 (8th Cir. 1973). Defendants provide evidence of the following undisputed facts in support of their argument that a reasonable time for termination had passed as a matter of law: (i) the ICA lasted for a period of 14 months between the time of its inception and the date that DMS attempted to terminate it on June 10, 2021; (ii) Tactacell has acknowledged that it invested no more than $10,000 in the ICA;[4] (iii) there is no evidence that Tactacell performed services, incurred expenses, or otherwise acted in reliance on the continuation of the ICA beyond the dates identified by DMS; and (iv) as of June 30, 2021, the date DMS calculated its last accounting of Tactacell's commissions, Tactacell had not only recouped all of its investment in time and money, but had made a significant profit.[5] Thus, according to DMS, a reasonable time had lapsed as a matter of law and the ICA was capable of being terminated.

---

[4] [Doc. 353-9, pp. 3-4].

[5] DMS contends that Tactacell's commissions through June 30, 2021, were $32,683.61, a more than 300 percent return on Tactacell's largest possible investment in the ICA. [Doc. 353-2, 353-8]. Tactacell disputes the amount of commissions actually owed, but its expert report setting forth its calculations and claimed commissions do not reflect the services performed. [Doc. 353-10].

Page **8** of **20**

Tactacell responds that the theory of equitable recoupment should not apply at all, urging a stark distinction between the ICA and franchise and distributorship agreements, contracts to which the doctrine of equitable recoupment are typically applied. But Tactacell's argument is unsupported, and Minnesota jurisprudence endorses a broader application of the recoupment theory to contracts like the one at issue here. *Glacial Plains* involved a grain-handling contract between the operator of a grain-processing facility and the operator of an ethanol plant. Although the parties disagreed about whether the doctrine of equitable recoupment could be applied to that contract, the court broadly interpreted the recoupment theory as applicable to non-exclusive distributorship agreements, finding that these types of "relational contracts" pose the same practical problems as franchise agreements. *Glacial Plains III*, 2019 WL 4409417, at *4.

Similarly, in *Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.*, the Eighth Circuit examined distributor, franchise, and agency contracts and noted the substantial overlap among them, particularly when these contracts lack a fixed termination date and contemplate an ongoing relationship between the parties. 825 F.2d 167, 172 (8th Cir. 1987) n.10. The court recognized that such agreements frequently function as "relational contracts," requiring analysis beyond the contract's express written terms, including consideration of the parties' course of performance.[6]

---

[6] For example, franchise contracts involve continuing obligations on both sides as opposed to one-time transactions, and in franchise relationships, the franchisee builds goodwill for both his own business and the franchisor's brand. *See, e.g., Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir. 1979). This dual goodwill development creates an interdependence that extends beyond simple buyer-seller dynamics and one-time transactions.

Page **9** of **20**

*Id.* While the ICA is a personal services contract that – unlike many franchise agreements – did not require a sizeable initial investment by Matt Busbice, the Court finds that the ICA poses the same practical considerations as franchise agreements when it comes to termination. The application of equitable recoupment to the ICA, inclusive of the time spent by Matt Busbice in service of Defendants, is therefore consistent with the spirit of Minnesota contract law.

Tactacell takes the position that the "proper inquiry is not when DMS 'could have' terminated the ICA, but rather how long the ICA would have continued absent DMS' breach." [Doc. 359, p. 13]. Tactacell argues that DMS owner Jeff Peel provided Tactacell with detailed five-year financial projections before Tactacell entered the ICA, which extended through 2024 and which showed anticipated commission payments on potential profits totaling $141 million. [Doc. 265-1]. Thus, Tactacell argues that because the parties intended to have a long, mutually beneficial relationship, it is entitled to recover all future profits it had hoped to realize.

But Tactacell's arguments ignore several important points of Minnesota jurisprudence. First, a party is generally not entitled to lost *future* profits arising from a contract that is terminable at will. *See, e.g., Sofa Gallery, Inc. v. Stratford Co.*, 872 F.2d 259, 263 (8th Cir.1989) (applying Minnesota law). *See also Glacial Plains III,* 2019 WL 4409417, at *4 (Eighth Circuit has rejected considering a party's future profit in a recoupment case and considers actual profit only to the extent that such profits "amortized" a party's initial investments in the contractual relationship), citing *Ag-Chem,* 480 F.2d at 489 (recoupment damages recoverable in Minnesota are limited to the distributor's "unrecouped expenditures, taking into account the value

of any benefits it may have derived from the arrangement during its existence or may derive thereafter."). *See also Schultz v. Onan Corp.*, 737 F.2d 339, 348 (3d Cir.1984) ("The plaintiff is not permitted to recover damages for loss of future profits. Recovery for future profits is prohibited because recoupment is an equitable doctrine intended to restore the franchisee's lost investment, not to award damages at law for the going value of the business.") (discussing Minnesota law).

Furthermore, Minnesota law expressly limits courts' consideration of the parties' subjective intent or expectations regarding contract duration when conducting a reasonable time inquiry. *See Glacial Plains Coop. v. Chippewa Valley Ethanol Co.*, 2019 WL 4409417, at *4–5 (rejecting argument that a "reasonable time" for terminating an open-ended contract was based on the "intent of the parties" that it continue indefinitely, because that runs counter to either party's ability to terminate at will after a reasonable time).

Here, the ICA contemplated that Matt Busbice would provide DMS with consulting and advisory services. It was not a fixed-term relationship nor was it a capital-intensive arrangement requiring a prolonged operational wind-down. Furthermore, while the record generally contains very little evidence of Tactacell's performance under the ICA, there was some, albeit very limited, evidence presented during the Phase I trial that Matt Busbice took actions in 2021 that could be considered "services" under the ICA.[7] Further, Mr. Busbice testified at trial that a

---

[7] Mr. Busbice testified at trial:

Q: The product testing that you showed us yesterday was in 2020, right?
A: Yes. What I showed you yesterday, but I was still testing and using it in 2021.

non-compete provision in another consulting contract did not end until November 8, 2021, and allegedly prevented – as the parties had contemplated in negotiating the ICA – Mr. Busbice from being able to fully perform under the ICA. [Doc. 1, ¶ 12]. Therefore, while Tactacell has conspicuously failed to adduce any evidence that it was unable to recoup the time and capital it expended in furtherance of the ICA, testimony elicited during the Phase I trial creates issues of fact regarding what services Mr. Busbice actually performed in 2021. Accordingly, there are disputed facts upon which a fact-finder may conclude that a reasonable time for termination extended beyond the termination dates asserted by DMS. Considering the foregoing, the issue of whether the ICA was terminated in 2021 will be reserved for the jury and summary judgment on this issue is not appropriate.

---

> Q: You did not show any product testing to the company in 2021, right?
> A: I believe I did. I sent text messages using the camera. Perhaps. I would have to pull the files.

[Doc. 385, pp. 17-18].

He further testified:

> Q: See that very first sentence, (reading). Contractor will use commercially reasonable efforts to provide the following services. Do you see that?
> A: Yeah. We knew some of these services were restricted under my noncompete until December of 2021. I could only do certain things.
> Q: Again, sir, just yes or no questions please. Is it your testimony that you used commercially reasonable efforts to deliver these services, even though you attended no sales meetings in 2020 and 2021?
> A: Yes, I did perform services, for sure, under this. I'll just leave it at that.
> Q: That's not my question, sir. My question is, is it your position that you used commercially reasonable efforts to provide these six services, even though you attended no sales meetings in 2020 or 2021, yes or no?
> A. It's a confusing question to me. I said, yes, I did perform these services of what I could. I was restricted under a noncompete.

*Id.*, pp. 333-34.

### C.     Reasonable Notice

Once an indefinite duration contract has run for a reasonable time, Minnesota law requires reasonable notice of termination. *Glacial Plains*, 912 N.W.2d at 237. Under Minnesota law, reasonable notice is that period of time necessary to close out accounts and minimize losses. *Viking Supply*, 310 F.3d 1092, 1098 (8th Cir. 2002), *citing Sofa Gallery, Inc. v. Stratford Co.*, 872 F.2d 259, 263 (8th Cir.1989). The Court recognizes that Minnesota law does not apply a bright-line rule to the determination of what constitutes reasonable notice in the termination of an indefinite-duration contract. Instead, like reasonable time, whether notice was reasonable is a question of fact that depends on the circumstances and evidence presented, including the nature of communications, the parties' conduct, and the time afforded to the non-terminating party to adjust or wind up its affairs. *See generally Glacial Plains*, 2019 WL 4409417, at *6, *citing Glacial Plains III*, 912 N.W.2d at 237. While notice is often a question of fact for the jury, the question becomes one of law appropriate for summary judgment when only one inference can be drawn from the undisputed facts. *Grp. Health, Inc. v. Heuer*, 499 N.W.2d 526, 529 (Minn. Ct. App. 1993), *citing L & H Transport, Inc. v. Drew Agency, Inc.*, 403 N.W.2d 223, 227 (Minn. 1987).

Importantly, the threshold question of whether a reasonable time has passed must be determined before addressing the adequacy of notice. In *Glacial Plains III*, the court expressly clarified that the Minnesota "supreme court held that the contract 'is terminable at will by either party upon reasonable notice *after* a reasonable time has passed.' ... [and that] the district court must first determine whether a reasonable time has passed *and then* determine whether the notice given was reasonable." 2019

WL 4409417, at *6 (emphasis in original). This sequential analysis ensures that parties cannot terminate indefinite contracts immediately upon formation, even with adequate notice.

Here, DMS provided written notice of termination to Tactacell by letter dated June 10, 2021. As explained above, the Phase I jury verdict determined only that Defendants' termination *for cause* was not legally effective under the express terms of the ICA. But DMS is correct that the jury's verdict did not render the June 10, 2021, letter irrelevant for purposes of reasonable notice. To the contrary, the letter constitutes objective evidence of DMS's intent to terminate the relationship and therefore marks the earliest possible commencement of any reasonable-notice period. Thereafter, on August 16, 2021, Rick Dold, counsel for DMS, sent a letter to Jonathan Forester, counsel for Tactacell, stating DMS's position that the ICA was terminated. [Doc. 353-6]. And on October 12, 2021, Mr. Dold sent a letter to Mr. Forester, again stating that the ICA was terminated. [Doc. 353-7]. Based on the foregoing evidence, Defendants seek an order recognizing that the reasonable-notice period extended through either December 31, 2021 – more than six months after the June 10, 2021, termination letter – or, at the latest, March 22, 2022, the date that Tactacell filed the Complaint in this matter.

In response to Defendants' Motion, Tactacell provides no evidence of ongoing services after mid-2021 or reliance on the ICA for anything other than the hope of future profits. Tactacell has not identified any pending work that needed to be completed, any contract-related arrangement requiring prolonged operational winddown, or any other evidence fairly demanding a longer notice period. [Doc. 353-

12, Tactacell's Second Supplemental Responses to Defendants' Second Set of Requests for Production of Documents, No. 16, pp. 3-7] (conceding plaintiff has no "records or information" to substantiate any investments in furtherance of the ICA). Moreover, the ICA did not require Tactacell to maintain inventory, facilities, or employees dedicated exclusively to DMS. On these facts, Minnesota law does not require extended notice periods measured in years. *See Viking Supply*, 310 F.3d at 1098 (reasonable notice allows time to wind up and mitigate losses).

Nevertheless, because there are disputed facts concerning when a reasonable time had passed in order for the ICA to be terminated, the Court cannot determine, as a matter of law, that reasonable notice was given no later than December 2021. That question, too, is an issue for the jury.

### D. Outside Limits of Reasonable Time and Reasonable Notice

Despite not being able to resolve disputed facts about whether a reasonable time had passed and reasonable notice was given in 2021, the Court finds that the summary judgment evidence is clear that, under Minnesota law, a reasonable time had certainly passed by the time the Complaint was filed in March of 2022.

In its Motion, DMS argues that by the time Tactacell filed its Complaint, Tactacell was aware that DMS intended to terminate the contract, or believed that it had already done so.[8] And while Tactacell did not seek termination of the ICA in its

---

[8] *See* Complaint, Doc. 1, ¶ 30 ("On or about June 10, 2021, Deer Management, through its counsel attempted to terminate the Agreement with Tactacell without valid reasons as provided by the contract."); ¶ 31 ("Deer Management attempted an improper termination."); ¶ 58 ("On or about, June 10, 2021, Deer Management attempted to improperly terminate Tactacell alleging Tactacell has not performed under the Agreement."); ¶ 71 ("Deer Management attempted to terminate the Agreement before the conditioned precedent had occurred, mainly the expiration of the other entity's non-compete clause on November 8,

Complaint, in its Answer, DMS clearly states its belief and intent that the ICA was terminated. [Doc. 18, ¶¶ 30, 72, 95]. In support of its Motion, DMS also identifies written notices of termination that it sent to Tactacell, as follows: (i) the termination notice dated June 10, 2021; (ii) an August 16, 2021, letter from Rick Dold, counsel for DMS, to Jonathan Forester, counsel for Tactacell, stating DMS's position that the ICA was terminated; [Doc. 353-6]; and (iii) an October 12, 2021, letter from Mr. Dold to Mr. Forester, again stating that the ICA was terminated. [Doc. 353-7]. Defendants, therefore, in the alternative, seek an order finding that the ICA terminated – at the latest – as of March 22, 2022, the date Tactacell filed the Complaint in this matter.

In response, Tactacell adduces no evidence from which a reasonable fact-finder could conclude that a reasonable time had not passed or that it required notice beyond March 2022 to wind down services or mitigate losses arising from its relationship with DMS. Indeed, no reasonable jury could conclude that the ICA survived beyond the filing of the Complaint, as *neither* party was performing under the ICA as of March 2022. And while Mr. Busbice testified at trial about services he alleges he performed for DMS in 2021, there is no testimony or evidence in the record that Busbice provided any services to DMS after 2021.

---

2021."); ¶ 72 ("Deer Management attempted to terminate the Agreement on June 10, 2021, months before the expiration of the non-compete clause."); ¶ 75 ("Deer Management has not acted in the spirit of good faith and fair dealing by attempting to improperly terminate Tactacell without any supported or valid reason."); ¶ 76 ("Thus, Deer Management breached the Agreement by its improper termination.").

As for Tactacell's argument that the jury rejected DMS's June 10, 2021, letter as a proper termination, and, therefore, proper notice, the Court finds that Tactacell improperly frames the issue. The Phase I jury verdict determined only that Defendants' termination *for cause* was not legally effective as of that date, and DMS is correct that the jury's verdict did not render the June 10, 2021, letter irrelevant for purposes of reasonable notice. To the contrary, the letter also constitutes objective evidence of DMS's intent to terminate the indefinite-duration contract between the parties. And the two additional letters sent to Tactacell by DMS in August and October 2021 further bolster DMS's argument that Tactacell knew of DMS's belief that it had, in fact, terminated the ICA by the end of 2021. Tactacell's allegations in its Complaint confirm its knowledge of that fact.

In *Glacial Plains II*, the district court stated that "[i]n determining adequacy of notice to terminate a contract of indefinite duration … nothing could send a clearer message of intent to terminate and provide more reasonable notice of such termination than service of a complaint seeking as relief dissolution of the partnership." 2018 WL 8049074, at *1, *citing Plainview Milk Prods. Co-op. v. Marron Foods, Inc.*, 3 F. Supp. 2d 1074, 1079 (D. Minn. 1998). The court went on to state that "[f]ollowing years of litigation relative to [defendant's] attempts and obvious desire to escape the grain-handling contract herein, this Court cannot say reasonable notice of termination has not been provided. *Id*. at n.1.

Here, based on the controlling jurisprudence and the facts offered by DMS, and further considering the lack of evidence offered by Tactacell to contravene DMS's summary judgment argument, the Court finds that March 22, 2022, marks the

outside window for when the ICA was terminated as a matter of law. Of course, the jury also may well find that the ICA was terminated sooner under the *Glacial Plains* analysis. Accordingly, summary judgment is granted to Defendants insofar as the Court dismisses any claims by Tactacell for damages beyond March 22, 2022.

## II. Appeal of the Magistrate Judge's Decision on a Motion to Compel [Doc. 357]

Magistrate judges are granted broad discretion to resolve non-dispositive issues and their rulings on these issues should be modified only if they are "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *see also Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995) (a district court shall "apply a 'clearly erroneous' standard when reviewing a magistrate judge's ruling on a non-dispositive, pretrial motion such as a discovery motion").

Here, Tactacell seeks discovery of updated financial information from DMS, including financial statements, future financial projections, and documents related to the valuation of DMS in connection with acquisitions or ownership changes. Tactacell argues that this discovery is relevant to the calculation of commissions, potential breaches of the non-circumvention clause in the ICA, and unresolved claims of alter ego and fraud involving defendant Tactacam, LLC, which Tactacell alleges concealed profits to reduce amounts payable to Tactacell. Thus, Tactacell argues that the requested discovery is relevant not only to damages stemming from the sale of DMS but also to liability, fraud, non-circumvention, and other issues it contends remain open for Phase II, and that the Magistrate Judge erred in deeming the requests moot.

Defendants respond that Tactacell's briefing before the Magistrate Judge framed the discovery as relevant solely to the sale of DMS and related damages; that after leave to amend was denied and affirmed, the requests are moot; that Tactacell forfeited new theories not presented to the Magistrate Judge; and that, regardless, the ruling was neither clearly erroneous nor contrary to law.

The record reflects that Tactacell's discovery motion and supporting briefing before the Magistrate Judge repeatedly characterized the requests as related to damages concerning the sale of DMS. Given the denial and affirmance of leave to amend to assert sale-related damages, the Magistrate Judge properly concluded that the sale-related discovery was moot. The Magistrate Judge's Ruling was grounded in the procedural history – specifically, the denial and affirmance of leave to amend to add sale-related damages – and in Tactacell's own framing of the discovery as sale-related. Therefore, Tactacell has not demonstrated that the Magistrate Judge's September 30, 2025, determinations were clearly erroneous in view of the case posture or contrary to law under Rule 26(b)(1) and Rule 72(a), and the Appeal will be denied.

## CONCLUSION

Considering the foregoing,

IT IS HEREBY ORDERED that the MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE TERMINATION DATE OF THE ICA filed by Defendants [Doc. 353] is hereby GRANTED IN PART and DENIED IN PART. The Motion is GRANTED insofar as all claims alleged by Tactacell for damages beyond March 22, 2022, are DISMISSED.

The Motion is DENIED in all other respects. Tactacell's request for a hearing in connection with the foregoing Motion [Doc. 360] is DENIED.

IT IS FURTHER ORDERED that Tactacell's MOTION TO REVIEW MAGISTRATE JUDGE'S RULING on a Motion to Compel [Doc. 357] is DENIED and DISMISSED, and the Magistrate Judge's Memorandum Ruling denying the Re-Urged Motion to Compel Responses to Discovery [Doc. 279] as moot is AFFIRMED.

THUS, DONE AND SIGNED in Chambers on this 30th day of January 2026.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE